Gopalratnam v. ABC Insurance Company Yes, sir. May it please the Court. Good morning. My name is Paul Falk. I represent the plaintiff appellants in this case. This is an appeal of the trial court's order that barred Fire Investigator Michael Hill, a certified fire investigator and battery expert, Dr. Daniel Dougherty. The trial court determined that Mr. Hill and Dr. Dougherty were qualified to render their opinions. The trial court concluded, however, that neither Mr. Hill nor Dr. Dougherty's opinions were reliable. The case itself, my client's case, involves a fire that took the life of their son. The factual issues are typical of a fire case. The questions are where did the fire originate and what caused the fire. These fact issues are usually decided by a jury. In this case, the trial court erroneously weighed the evidence underlying Mr. Hill and Dr. Dougherty's conclusions and by so doing usurped the function of the jury. The key legal issue on this appeal is whether the trial court applied the correct legal standard to the question of whether or not Mr. Hill's, Mills' and Dr. Dougherty's opinions were reliable. And to determine reliability, Dalbert and the Seventh Circuit in the Stallings decision, the court clearly wants the trial court to focus on the expert's methodology and not invade the province of the jury by analyzing the expert's conclusions and factual underpinnings of those conclusions. The expert conclusions and the facts underlying those conclusions may be in doubt, but that's irrelevant for purposes of determining whether a jury should hear what the expert has to say on that issue. Appellants seek reversal of the trial court's decision and a remand so that a trial can be had on these issues. Now the proper methodology for investigating a fire is to first determine the origin of the fire. Then the sources of ignition are identified in the fire's area of origin. The fire investigator brings in experts that can rule in or rule out each sources of ignition within the area of origin. NFPA 921 sets this procedure out very well, and this is the methodology filed by the appellant's experts in this case. Now for purposes of this appeal, this story can start in the aftermath of the tragic fire. Special Agent Martinez with the Wisconsin Department of Justice came in and led the fact investigation for the official fire investigators along with the Menomonee Falls Fire Department, the ATF, and the Menomonee Falls Police Department. They did a thorough investigation, and Special Agent Martinez's report is in our appendix. Special Agent Martinez, based upon the fire patterns, determined that this fire either started in the bed and burned up or in the ceiling, fell down onto the bed, and he based that on fire patterns. He also ruled out that this fire was intentionally set. The remains of the laptop and cell phone were taken into evidence since they were on the bed in the potential area of origin, at least one of them, by Special Agent Martinez. Now three days after the fire, Fire Investigator Hill, who was barred, got to the fire scene, met with Special Agent Martinez, and went over his investigation and gathered facts from his investigation. He then did a thorough investigation, working from the exterior, least fire damage, in to the most fire damage, looking at burn patterns. He collected data, he interviewed witnesses, and his investigation is detailed in our brief and is consistent with NFPA 921. NFPA 921 affirms that a systematic analysis of fire patterns can be used to lead back to the heat source that produced them. Mr. Hill concluded that the fire was not intentionally set, and that careless smoking did not cause the fire, and he provided detailed basis for each conclusion he reached, which is in our brief. In Westfield... Could you please spend a moment on the question of flashover as to Mr. Hill? If there were calculations that would have supported Mr. Hill's assumption that flashover did not occur, then why was he not obliged to perform those calculations? Especially since, as I understand it, there were some signs consistent with the flashover having taken place. Well, let me speak from the record first, and then... The record itself indicates that some of the official investigators thought that the room might have reached flashover. They didn't do any of those calculations. The calculations involving flashover, Your Honor, and I'll answer the question... What matters here is that Mr. Hill did not do the calculations that would have ruled out flashover. Well, let me... Because he acknowledged that there were at least some signs of flashover that may have occurred. Okay. I mean, I think you need to really zero in on him because, you know, he's the one that Judge Pepper refused to accept as an expert. Let me answer your question. He did not do the calculations regarding flashover because he didn't think they were necessary. And he didn't think they were necessary because the flashover did not obscure the fire patterns which allowed him to conclude that there was an area of origin. Your Honor, so flashover... Flashover, as you know from probably studying the material, Your Honor, flashover is when a room... The fire starts in a room, okay? It starts in a corner, for example. It burns up. The hot products of combustion, they form at the ceiling. The room gets so hot that all of a sudden the auto-ignition temperature of everything in the room, these papers on my desk, my clothing, erupt into flame. Mr. Hill did a detailed analysis and found that there was a bed stand that was not fire damaged. There were other artifacts that were not fire damaged. There's no indication that this fairly complex... You need to know the heat release. You need to know what started on fire first. You need to know the heat release of what started on fire. You have to put that into a model, okay? And you have to look at the volume of the room. These are complex calculations. Mr. Hill said whether the... His testimony under oath in his deposition is whether or not the room reached flashover was not important to him because the fire patterns were there. Special Agent Martinez made the same conclusions. He didn't say, oh my gosh, this whole room is toast. There are no fire patterns. He didn't say that, Your Honor. So that's why he didn't do that test or those calculations, because they weren't important for his decision. Does that answer your question? Well, yes. Okay, thank you. In Westfield v. Regal-Beloit, a 2015 Illinois District Court decision, the court ruled that NFPA 921 methodology is reliable. And the court held that an expert who followed NFPA 921 should be able to testify in front of a jury, even if there is some doubt about his conclusions. And, Judge Rovner, in Westfield, there was also the argument that the defendant should have done a test that they could have done. And it was pointed out that NFPA 921 gives the investigator discretion on whether or not to do the test or not, simply because there is a test available, doesn't mean it necessarily has to be done to reach a conclusion. And Westfield is consistent on that point. But the trial court in this case did not even analyze whether Mr. Hill followed NFPA 921. Didn't even go there. They went to his underlying factors. The court analyzed underlying factors. And we've gone through that in our brief. Once Hill had determined an area of origin, we brought in electrical engineers that ruled out electrical in the entire room. Ruled out electrical in the entire room. The only thing left at that point, and you recall the methodology of NFPA 921, the only thing left in the area of origin was the Hewlett Packard laptop and a Nokia cell phone. And the plaintiff brought in Dr. Dowdy, a highly qualified lithium ion battery expert. He's got years of experience with the chemistry of lithium ion batteries, observing testing and determining what internal and external factors cause these batteries to fail. He knows the subject cold. Well, that may be so, but he conceded in his deposition that there is no scientific literature supporting the notion that one can infer from differential damage in battery cells that one particular cell had an internal fault resulting in thermal runaway. I don't understand how we reconcile this inconsistency. I saw, you know, in the briefs that you maintain that he was answering a very specific question, but his answer to that question seems wholly inconsistent with the reasoning behind his opinion as to what occurred with cell A. And it's just hard to get past that. Well, let me try to help you out just a little bit. The question, if you go back to that deposition testimony, in the exchange between counsel and Dr. Dowdy, he says that there is scientific literature that supports his opinions with respect to differential damage. He is asked specifically if there is scientific literature that says, that says, and that's the way that he took that question, because the Sandia report, Your Honor, that he cites, the Sandia report did testing and says that the results of lithium ion batteries to external heat provide predictable results. 1641, UL standard 1641, submits a battery to external heat, and if it explodes, it fails the test. Dr. Dowdy says that cell A involved in this case exploded and would have failed the test. If differential damage was not important, then how could the underwriter's laboratories have developed UL 1641, which requires some predictability? And so the totality of Dr. Dowdy's testimony with respect to this specific question was a narrowing. Well, okay, you say you have scientific literature that supports differential damage, but I'm asking you, and that was the way, typical cross-examination, but I'm asking you, do you have specific scientific literature that says, and he was narrowing and pushing Dr. Dowdy, that says, and Dr. Sardi says, well, no, I can't point you to scientific literature that says that differential damage can be used to analyze, but that's how he does it, and that's how he did it, and that's how the Sandia report did it, that's how the Finnegan argument did it. So it can't, it's certainly not the type of admission in the totality of his testimony that should be used to bar him from explaining that, either in redirect at trial or otherwise. You're about to expire your rebuttal time. I just want to make clear, the first thing that, just to illustrate one point, the court, instead of looking at Dr. Dowdy's methodology and the totality of his work on this case, first asked, well, is there any evidence to support that cell A acted as a projectile? And that's an odd, odd question, but it's also revealing. It's an odd question because there was evidence that this battery had violently exploded, violently exploded. The cell can was elliptical. The interior fuel part, the lithium and the windings were blown out one end. The cell jammed into and was punctured on its way out of the laptop. He testifies to this, but the trial court is caught up with, well, he doesn't know exactly where it ended up. Well, does a scientist have to know where a rocket ended up to tell from the physical evidence of the rocket where it was? And it's revealing because this is the exact question. You can envision a juror, Juror A, saying, well, Dr. Dowdy said it acted as a projectile. Now you've done it. Pardon? Now you've done it. Now I've gone. And another juror saying, well, he says he's got other evidence, the physical evidence of the can distorting. And then the jury deciding that factual issue. Thank you, Your Honor. Mr. Batke. May it please the court. My name is Christopher Batke and I represent Hewlett Packard. And I'm speaking today for the entirety of the defense team. So I'm also speaking here on behalf. I'm joined by counsel for Dynapack and Samsung here, but I'm speaking on behalf of them as well. I think it's important at the outset to give some context to this fire. I understand the court is aware of the facts, but I think this was a heavily damaged compartment. Everything in that compartment looked different than it did before the fire started. And no one disputes that. In addition, there were aspects of this fire that all fire investigators had difficulty in explaining or understanding. This was an able-bodied young man who was by all evidence awake at the time of this fire, was not intoxicated, who for some reason or another was unable to make his way out of this fire that day. In addition, there was a burn pattern that was very significant and was unexplainable. And even Mr. Hill, plaintiff's fire experts, called it the 24 or $25 million question. And the reason why it was a 24 or $25 million question for him is because he could not explain why this door was broken down early in the life of the fire and why it showed burn patterns on the exterior of the door and not on the interior of the door, the part of the door that faces the room. In other words, if one were to opine that there was a fire that started inside a door with the door closed and then the door is busted down to get out, one would expect that the fire damage would be on the inside of the door facing the room as opposed to the exterior of the door. And so that was an aspect of this case that Mr. Hill called the $24 million question, I can't explain that. Now I'll loop back to that when I speak about Mr. Hill specifically, because Mr. Hill purports to use a process of elimination. And under certain circumstances, the process of elimination could be an appropriate means to determine an area of origin for a fire. However, it is not proper to just simply eliminate and disregard evidence that you don't care to think of or can't explain. That is not how the scientific method works, and it's certainly not consistent with the dictates of NFPA 921. Now, there are, I gather, some indicia that cell A may have exploded that don't depend on where that cell was found in the bedroom. The distortion of the body, the puncture in the cell. Could you spend a moment on those indicia? Yes, I can, Your Honor, and I think it's a good question because I think there's been some use of terms in this matter that aren't entirely accurate. And I think it probably would help for both nomenclature purposes to explain that and then explain the difference. Expelling contents should not be considered as synonymous with exploding. Exploding means something different in the battery science world. And so, if I may, I'll explain that and then I'll answer your question specifically, Your Honor. With respect to, and the actual UL test is 1642, it is not 1641, it is UL 1642. And the projectile test that is referred to and is of import for reasons I'll get to in a moment, has the tester take a cell and expose it to external heat and then it has a screen set a certain distance. I think it's three to five feet, Your Honor, but don't hold me to it. I'm not a battery scientist, but there is a screen that is a certain distance away from the cell. Now, under the 1642 test used in the industry and promoted by Unwriter's Laboratory, a battery can expel its contents as long as it does not penetrate the screen. So it can hit the screen, it can leave the battery, it can expel its contents, but as long as it doesn't penetrate the screen, it has not exploded. It has merely expelled its contents. So the first point I would make is, I believe that the evidence in this case demonstrates that one cell expelled its contents. I do not concur that the evidence shows that it exploded. So that's the first point, as indicated. So it was not a projectile, or there is no evidence that it was a projectile. With respect to the hole in the can, I don't believe that there's been offered any scientific basis to indicate that that hole was the result of something that occurred during the fire, as opposed to after the fire, during the overhaul efforts, when that particular cell was shoveled outside and buried in the debris of pile where it sat for at least three days. And I want to speak to that, Your Honor, because Mr. Falk makes a great deal about that hole, but if Your Honor looks at the record, Mr. Dowdy was asked about the exemplar. His theory is that he looked at an exemplar battery pack, and he saw a metal pin in that exemplar battery pack, and then it was from that that he extrapolates, ah, what must have happened is this thing hit that metal pin, and then it bounced out and goes flying across the room. However, at his deposition, he conceded he did not know if that was a dynapack battery pack. In other words, his whole theory is based on examining exemplar that had a metal pin on it without ever, to this day as we sit here, providing any evidence that a dynapack battery pack has that metal pin in the same location. So I submit to you, Your Honor, in answer to your question, that I do not agree that there is indicia of an explosion of that cell. I believe there is an indicia of a battery going into thermal runaway and expelling its contents. And which brings me to another point about Dr. Dowdy's opinion and the lack of scientific foundation for it. We have indicated in our briefing, and as I think the district court in its very extensive opinion, and I would just add, you know, on the standard of this court giving great deference to the trial court's decision, it not being upheld unless manifestly erroneous, part of the reason is when you're dealing with issues like this, it requires a deep dive by the trial court. And in fact, the court conducted that deep dive here, meaning getting to the scientific method, the science behind it, and whether there are scientific underpinnings for an opinion. The court conducted a hearing that was almost, I think it was over two hours. So we had extensive briefing, a very vast record of information, a hearing that lasted over two hours, and a 40-page opinion in that regard. Now the plaintiffs make the point in the reply brief that although Dr. Dowdy did not do testing to support his theory, there is scientific literature, like the Sandia Report, that supports his belief that batteries will respond in a consistent, predictable way. When exposed to external heat. How do you respond to that? Yeah, I understand that they say that, Your Honor. I would respond a couple of different ways. First off, we have proffered peer-reviewed scientific literature that says otherwise, and I refer specifically to Linden's handbook on batteries, which demonstrates in a portion that we cite that there is differential damage between batteries. I'm sorry, that there can be differential damages in batteries, but it's the exact opposite of what Mr. Dowdy contends the scientific literature shows. Secondly, and I think it's important, at the end of the day, Dr. Dowdy's opinion is simply, you can look at a battery, and if one looks more damaged than another post-fire, that's the one that caused the fire. That's it. And I would submit that if the scientific literature said that, it would be quite easy to quote a statement anywhere that says that. And in fact, what I think the district court noted, and I think what Your Honors will find if you read those articles and you read the brief, there is no quoting of any of the scientific literature to say that. There are Mr. Dowdy saying the scientific literature says that. However, as Your Honor noted, under cross-examination at his deposition, when he could actually be drilled down on it, I asked him, give me literature that says that, and he could offer none. Now, we have proffered evidence that you could expect a stochastic response between batteries. That is to say, a varied response. And the analogy I would use, because sometimes we throw around words like stochastic, and being a lawyer, I'm not sure I'm the best scientist, but it would be popcorn. Popcorn that you pop can have a stochastic response to heat. That is to say, some popcorn pops and some doesn't. That is a stochastic response. A fire scene, a fire is varied. Consumer electronic products get attacked from different points of view, and they have different responses as a result of that. And so the scientific literature supports the notion that there can be a stochastic response. And I would add, Dr. Dowdy could have tested it. So, one, I do not believe there's a dispute about the scientific literature. I think his answer at his deposition was the truthful and honest answer, there is no scientific literature that supports his position. Secondly, I believe if you look at the briefs that have been proffered by the plaintiff, they make reference to scientific literature, but they do not quote the scientific literature to say what they say it says. And thirdly, it could easily be tested. Of course, you just get some exemplar battery packs and expose them to fire. If they all behave the same over a period of certain number of tests, then an expert would have a foundation to come to this court and say, or come before the trial court and say, I put batteries, I got X number of exemplar batteries from Dynapack and Samsung, I exposed them to uniform heat, and they all behaved the same every single time. But he did not do that, and he admits that he did not do that. Essentially, Dr. Dowdy's opinion is pure ipsa dixit. It is because I say it is. Now, I note that Mr. Falk raises this issue of the projectile, and he says, well, the court shouldn't look into whether or not, there is no evidence that this thing behaves as, quote unquote, a projectile. We know for a fact, and it is undisputed, that the battery cell did not find itself outside of the house, on the ground, beneath a pile of other debris, as a result of it having gotten there on its own accord. So with respect to this rocket scenario, if the rocket is sitting in a garage, and you know it didn't get there by using its rockets, it did not behave as a rocket to get into the garage. In this particular case, the battery was found in a pile of debris outside of the house. It didn't get there by acting as a projectile. It obviously got there by some other means. So there is no evidence whatsoever that it acted as a projectile. And that gets us to the scientific method. An expert cannot simply, one, pick the facts himself, create facts himself in his own mind, and then hypothesize a theory based upon those facts without at least in some way, shape, or form, testing that theory, or offering some other scientific support to justify that position. That's the scientific method, and that's what's required by Daubert. One last point on the issue of the scientific literature. Mr. Dowdy references a report, an exponent report by Melojovic. I may not pronounce it correctly, I'll just call it the exponent report. But we proffered a report from one of the co-authors of that article, which says the article says exactly the opposite of what Dr. Dowdy says it says. So we have a situation not much different than what we might see in the law, where someone references a case for a proposition that it doesn't stand for. And that's what's happening here with respect to the scientific literature. Mr. Hill, if I may. Mr. Hill does not, in any way, meaningfully follow the dictates of NFPA 921, which itself, at some level, is a fire guide adaptation of Daubert, because it requires the scientific method. It requires any hypothesis, by its terms, requires any hypothesis offered by a fire investigator to be tested against evidence. And if you test it against the evidence and it doesn't work, you must reconsider your hypothesis. In that regard, the methodology employed by Mr. Hill is entirely flawed, and there has no scientific basis under Daubert and Rule 702. I can just point to a few things. The critical question of flashover, the reason why flashover is critical, is because, uniquely, Mr. Hill offers a point of origin as opposed to an area of origin. In other words, he's not saying basically the whole room. He's saying right on that bed, right on the laptop. And because flashover involves near full room involvement, he has to try to explain away what the other investigators found. And he did not, with all due respect to appellant's counsel, he did not testify that he didn't do the calculations because he didn't think it was necessary. He testified he didn't do it because he did not know how to do it. He indicated that it could have been done, and certainly they could have engaged an additional expert to do it, but he didn't do it because he did not know how to do it. And I submit this is a flaw that is seen throughout his opinion, which is if there is evidence that is not supportive of his position, he simply does not take it into account or disregards it. And that is not an application of the appropriate method of process of elimination because you must consider, under NFPA 921, you must consider the item, test the hypothesis on why it's excluded, and then exclude it. And he did not do that. I think I may be out of time. Thank you. Thank you. You were out of time, but you may have an additional minute. Thank you. Just very brief, thank you. Once again, we don't hear critiques of Mr. Hill's and Dr. Dowdy's methodology. We go right to the facts as if we've tried this case. We haven't tried the case. Our experts didn't stand in front of the jury. They weren't heavily cross-examined. The issue of flashover wasn't in front of the jury. Is it important? I told you that Mr. Hill testified that he said it wasn't important to him and that there were enough fire patterns in there. I said that. I didn't say he said the fire, as counsel suggests, he said the fire started on the laptop. He said it started on the bed. And then he brought in the expert to take a look at the laptop. Were he or not, and we get into these arguments about the scientific literature. Counsel says, in answer, Judge Rovner, to your direct question, he says the scientific literature probably says that, you know, external heat, probably says that external heat, you know, provides consistent results. UL 1642, you know, we went over that. Then he says, oh, well, but it's random. It's up for the jury to weigh that scientific literature if it's supported. That particular, one more minute, that particular, whether or not it exploded, my Lord, I've got no evidence that Celi exploded. I've got a well-respected, experienced man, more experienced than anybody in this room who testified it's exploded. Who followed the proper methodology. My God, I've got a right to get that in front of a jury. All right. I think we have that argument, Mr. Falk, and I appreciate that. And Ms. Fedke, we have your argument. Thank you both. And we'll take the case under advisement and proceed to take a 10-minute recess.